**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SUSAN WASHINGTON,**

          **Plaintiff,**

**-vs-**                                   **Case No. 6:05-CV-1456-ORL-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

**ORDER**

      This cause came on for consideration without oral argument on the Complaint

filed by Susan Washington, seeking review of the final decision of the Commissioner of

Social Security denying her claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. Nos. 8, 9.  Pursuant to the consent of the

parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. Nos. 12.[1]

---

[1] On May 25, 2006, this case was dismissed for failure of prosecution.  Doc. No.
16.  The case was later reopened based on a motion made by substitute counsel for
Washington.  Doc. Nos. 22, 24.  Thereafter, the parties filed their respective memoranda
of law.  Doc. Nos. 28, 29.

## I.      PROCEDURAL  HISTORY.

In August 2001, Washington applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as the Act).  She alleged that she became disabled on December 1, 1998.  R. 67-69. Washington's application was denied initially and on reconsideration. R.  27-49.

Washington requested a hearing before an administrative law judge (ALJ).  R. 50. An ALJ held a hearing on February 12, 2003.  Washington, who was not represented by counsel or a nonattorney representative, testified at the hearing.  R. 429-66.

After considering the testimony and the medical evidence presented, the ALJ determined that Washington was not disabled, using the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, as a framework. R. 303-10.  On review, the Appeals Council vacated the ALJ's decision and remanded the case with directions to obtain updated medical records, provide specific references to evidence of record in support of the RFC determination and, if warranted, obtain evidence from a vocational expert.  R. 317-19.

On remand, the case was assigned to a different ALJ.  He held another hearing on December 6, 2004, at which Washington was represented by an attorney. Washington and Tom Laughman, a vocational expert (VE) testified at the hearing. R. 392-426.

After consideration of the testimony and review of the medical records, the ALJ found that Washington was insured under OASDI through March 31, 2003.  R. 25.  The ALJ found that although Washington had worked after her alleged disability onset date, that work did not constitute substantial gainful activity. *Id.*

The ALJ concluded that the medical evidence showed that Washington had polyarthritis with symptoms associated with rheumatoid arthritis, mild lumbar degenerative disc disease, secondary fibromyalgia, a hiatal hernia, a history of a mixed connective tissue disorder with stable symptoms, and mild symptoms of depression, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2]  R. 25.

The ALJ concluded that Washington had the residual functional capacity (RFC) to do the following:

> [L]ift 10 pounds frequently and 20 pounds occasionally. . . . [S]he has only mild limitations with respect to bilateral dexterity and her gross/fine manipulations are well preserved. She has retained the capacity to perform an essentially full range of light exertional work activities.  Her nonexertional impairments stemming from mild symptoms of depression, discomfort, lack of energy and shortness of breath do not significantly limit her ability to perform sustained light work activities.

---

[2]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

R. 25.  In reaching this conclusion, the ALJ made a thorough review of the record.

Based on that review, he found that Washington's testimony about the limitations arising

from her impairments was not credible to the extent alleged.  R. 23.

The ALJ found that Washington's past relevant work required the ability to

perform in excess of her RFC.  23-24.  Using the Grids as a framework, and considering

the testimony of the VE, the ALJ concluded that Washington was not disabled.  R. 25-

26.

Washington requested review of the ALJ's decision. R. 10.  On July 26, 2005, the

Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.

Washington timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction

to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.     STATEMENT OF FACTS.

The facts of record are adequately stated in the ALJ's decision and in the parties'

memoranda.  Accordingly, I will only summarize the pertinent facts to protect

Washington's privacy to the extent possible.

On the date last insured, Washington was 45 years old.  R. 395.  She had a high

school education and training as a licensed practical nurse (LPN).  R. 396. She had

worked as a LPN.  R. 397.  She tried to work after December 1, 1998, the alleged onset

date of her disability, but it made her symptoms worse.  R. 402.

Beginning at least by April 21, 1995, Washington sought treatment for fatigue and some achiness in her arms and legs.  She also experienced weakness from time to time. R. 178.

Medical records reflect that, in March 1996, Sarah Cochran, M.D., examined Washington based on her complaints of weakness and fatigue.  Washington did not complain of swelling or pain in her joints, but her fingers had turned white on occasion when exposed to cold.  Dr. Cochran noted that this symptom was indicative of Raynaud's phenomenon.  Washington had not noticed skin thickening, although Dr. Cochran observed slight thickening on palms.  R. 141, 143.  Washington denied difficulty swallowing (dysphagia).  R. 143. Dr. Cochran opined that Washington's condition was compatible with CREST syndrome, which is the previous name for scleroderma[3], limited to Raynaud's syndrome and possibly sclerodactyly.  R. 144; *see also* R. 134, Doc. No. 28 at 3 n.1.  On July 3, 1996, Dr. Cochran wrote that Washington was ready to return to work.  R. 140.

On April 19, 1996, Robert N. Kurtzke, M.D., examined Washington based on her complaints of numbness and waxing and waning weakness in her hands and legs exacerbated by effort.  R. 131-32. A nerve conduction study and neurological examinations were normal.  R. 127, 132.  Dr. Kurtzke's diagnosis was CREST.  R. 130.

Virginia D. Steen, M.D., evaluated Washington for possible connective tissue disease in February 1997.  Dr. Steen noted that Washington had a 13-year history of

---

[3] Scleroderma is a progressive type of connective tissue disease that leads to hardening and tightening of the skin and connective tissues.  Other symptoms of the disease include numbness and pain often brought on by cold, known as Raynaud's phenomenon, and sores over joints. Doc. No. 38-2 at 1-2.

Raynaud's phenomena but with no severe problems arising therefrom.  Washington reported that in the previous 18 months she had developed a muscle pain syndrome, with headaches, extreme fatigue and generalized weakness.  Dr. Steen observed no swelling or thickening of the skin on Washington's hands, and only subtle suggestions of skin thickening on her face.  R. 133.   Dr. Steen opined that Washington had very mild, early and limited scleroderma.  She observed that Washington's muscle pain was consistent with fibromyalgia even though she did not have the classic trigger points. R. 133-34.  Dr. Steen treated Washington with a muscle relaxant and recommended that she do water aerobics or regular walking.  R. 134.

On March 25, 1998, Rangappa Rajendra, M.D., wrote that the only abnormality he noted on examining Washington was an inflammation of the tendons of the muscles in her forearm.  R. 149.  During that time, Washington reported that when she was physically active, she experienced swelling but not in her joints.  She also complained of a headache.  R. 162.  In April 1998, she reported experiencing a fine tremor on occasion, but it was not present on examination.  She was also having swelling in a finger on her left hand.  R. 154.

On May 5, 1998, Washington was examined by Vicken V. Kalbian, M.D. Dr. Kalbian noted that Washington "seems to be stable and able to do her chores." R. 229.  His examination of Washington was unremarkable.  *Id.*

On May 28, 1998, R.S. Kadian, M.D., prepared an RFC assessment for Washington based on review of her records.  He opined that Washington could lift 10 pounds frequently.  She could sit, stand or walk about 6 hours in an 8-hour workday. She could only occasionally engage in postural activities, and she must avoid

concentrated exposure to fumes and the like.  He found no manipulative limitations.  R. 179-86.

In July 1998, another reviewing physician, whose name is illegible, prepared an RFC assessment based on a review of Washington's records.  This physician concurred with Dr. Kadian, except that he found that Washington could lift up to 20 pounds occasionally, could work around fumes but not hazards, and that she would have limitation in gross and fine manipulation due to scleroderma.  R. 187-94.

On January 22, 1999, Washington advised Dr. Kalbian that she had intermittent swollen areas on her arms and legs that were painful.  On that day, she had a nodule on her chest that was extremely tender.  R. 227.  After treatment with medication, the inflammation subsided but the nodule did not disappear.  Dr. Kalbian concluded that this was related to her connective tissue disease.  R. 226.  In August 1999, Washington denied any recent severe flares of her connective tissue disease except mild inflammation in her left forearm.  R. 223.

Washington was admitted to a hospital in November 1999 with complaints of chest pain.  R. 254.  A stress test was normal.  R. 246.  At the time of discharge, Mark Schroeder, M.D., suspected that the cause of the pain was esophageal.  R. 240.

On August 10, 2000, Washington told Lon H. McPherson, M.D., that she had had persistent shortness of breath for years.  Upon examination, Dr. McPherson noted adequate air movement without wheezing or rales.  R. 218.  Earlier records reflect that Washington used on inhaler to deal with her shortness of breath (dyspnea).  R. 217.  In September 2000, Washington complained of continuing shortness of breath on exertion, and recurring headaches.  R. 215.  She also had reflux esophagitis.  R. 213.

Dr. McPherson noted in November 2000, that Washington's connective tissue disorder was relatively inactive, and that Washington's hands did not show synovial thickening. R. 213.

In January 2001, Washington complained of sternum and shin pain and the need to keep her legs moving to be comfortable.  R. 213.  Her headaches had resolved, and there was no progression of her respiratory symptoms.  R. 213. Dr. McPherson noted that Washington's breathing problems, which might be asthma, were stable without medication.  R. 212.

In April, she complained of tingling in her legs worse with standing but not with walking.  R. 212.  Nerve conduction studies did not show any significant neuropathy. R. 211.

In June 2001, Washington reported numbness and weakness in both hands. Dr. McPherson found on examination that Washington's grip strength was intact. R. 210.  Use of prednisone improved her condition somewhat.  R. 197.  However, on August 30, 2001, Dr. McPherson observed that Washington had significant right ulnar neuropathy resulting in discomfort, tingling and weakness in the right hand to the point that she dropped some objects. R. 197.  Treatment notes reflect that Washington complained of numbness in her fingers in September 2001.  R. 233-35.

On October 11, 2001. William C. Amos, M.D., prepared an RFC assessment based on review of Washington's records.  He opined that Washington could lift up to 20 pounds occasionally and 10 pounds frequently.  She could sit, stand or walk about 6 hours in an 8-hour workday.  She could only occasionally perform postural activities.  R. 281-88.

Sam Ranganathan, M.D., examined Washington at the request of the SSA on December 31, 2001.  Washington reported weakness in her hands and wrists with spontaneous swelling in the joints with activity.  She also had tingling and numbness on and off.  Exposure to cold weather made her right hand tingly, numb and white.  She had occasional headaches.  She also complained of shortness of breach after walking for ½ hour.  She reported that she could sit for 1 hour.  R. 256.

Upon examination, Dr. Ranganathan found that Washington's grip strength was 4/5 in both hands.  Her "[g]ross and fine manipulations are well preserved."  He noted only mild tenderness in her wrist and discoloration of two fingers of the right hand.  R. 257.  Dr. Ranganathan opined that Washington could to the following:

> The patient is able to stand and/or walk about 6 hours per day.  Able to sit for 6 hours.  Able to lift and carry 20 pounds occasionally and 10 pounds frequently.  Occasional postural and environmental workplace limitation because of the above-said conditions.  Occasional manipulative limitations second to paresthesia in the hands.

R. 257.

Jeffrey J. Elston, M.D., examined Washington on January 3, 2002.  He found no skin tightening.  Her complaints of polyarthritis and myalgias seemed "fairly quiescent although she does have some intermittent problems with shortness of breath."  R. 260.

On January 20, 2002, M. delaCerna, M.D., prepared an RFC assessment after review of Washington's records.  Dr. delaCerna opined that Washington could lift up to 20 pounds occasionally and 10 pounds frequently.  She could sit, stand or walk about 6 hours in an 8-hour workday.  She should avoid concentrated exposure to extreme cold and fumes and the like.  R. 262-69.

An endoscopy performed in November 2002 revealed that Washington had a hiatal hernia and severe erosive gastritis.  R. 278.

Medical records reflect that from December 2002 through February 2004, Washington sought treatment for depression and fatigue.  She was treated with medication.  R. 270-72.

Dr. Elston examined Washington again in June 2003.  He noted that she had a decrease in her pulmonary function based on testing performed in May 2003.  R. 370, 374.

On October 20, 2003, Washington sought treatment for complaints of shortness of breath and fatigue.  She reported that she could walk 1.5 miles during which she sometimes had pressure near her collarbone.  R. 360.  The shortness of breath occurred on exertion; she was comfortable at rest.  R. 358.  In December 2003, E. Kevin Scanlon, M.D., did not find any primary pulmonary explanation for her symptoms.  He noted that Washington was slightly overweight and maybe mildly deconditioned.  R. 358.

At the ALJ's hearings, Washington complained of shortness of breath and tightness in her chest on exertion.  R. 398, 456.  Her scleroderma caused poor circulation and numbness and tingling in her extremities, exacerbated by cold temperatures.  R. 398.  The scleroderma also caused pain, swelling, peeling and weakness in her hands.  R. 399, 438.  Her fingertips were numb.  R. 458. She had problems walking, due to numbness and pain, and she sometimes lost her balance. R. 398, 401-02, 408.  She ached and was sore throughout her body.  R. 455.  She also was fatigued and weak overall.  R. 406.

Washington testified that she could not open jars, hold objects or cut her food. She had difficulty gripping a pen to write. She also had difficulty starting a car, shifting gears, and looking over her shoulder. R. 408, 436, 443. She could not turn a doorknob to open a door. R. 410. Continuous motion with her hand also aggravated her condition. R. 437. She could reach overhead, she was usually able to comb her hair, and she was able to brush her teeth. R. 400, 456, 457. She also had difficulty swallowing that worsened the longer she talked. R. 401. 410, 435, 448.

She could sit in an air-conditioned room about 45 minutes to 1 hour, and up to 2 hours in a non-air-conditioned room. R. 404. She could stand about 1 hour, and walk about 20 minutes. She could lift about 5 pounds with difficulty. R. 405.

The medication she took made Washington lethargic and dizzy in the morning. Her pain medication sometimes caused diarrhea. R. 412. She took an anti-depressant medication because she was not coping well with her problems. R. 454. She took a nap in the morning and another before dinner. R. 409.

The ALJ asked the VE to assume the following hypothetical individual:

> [A] younger individual . . . with a high school education and work experience [as performed by Washington]. [S]he can lift and/or carry 20 lbs occasionally and 10 lbs frequently. She can stand and/or walk about six hours in an eight-hour workday. Push and pull unlimited. Postural limitations are climbing, balancing, stooping, kneeling, crouching, crawling – occasional. And should avoid concentrated exposure to work around fumes, odors, dust, gases, poor ventilation.

R. 417. The VE opined that this individual could perform Washington's past relevant work as a companion. R. 417.

The ALJ then asked the VE to assume the same individual with the following additional limitations:

> Assume that I give full credit to the claimant's testimony as given here today, where she can sit in an air-conditioned area for 45 minutes to an hour at a time, and in a non air-conditioned area about two hours.  Standing about one hour at a time.  Walking about 20 minutes at a time.  Lifting and carrying 5 lbs.  She can bend.  Stooping she would need assistance.  And she has what she describes as a problem swallowing. . . . She has some speech difficulties . . . .

R. 418.  The VE opined that this individual could not perform Washington's past relevant work or any other work available in the national economy.  R. 418.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.   ANALYSIS.

Washington contends that the ALJ erred in his conclusion that her scleroderma[4] with Raynaud's phenomena caused only mild manipulative limitations.  She asserts that this conclusion arose from a misinterpretation of Dr. Ranganthan's findings and because the ALJ disregarded the opinion of one reviewing physician.[5]

Washington concedes that the limitations arising from her scleroderma, and particularly Raynaud's phenomenon, waxed and waned.  Doc. No. at 14.  Neurological and nerve conduction studies were normal.  Little thickening of the skin incident to scleroderma was noted.  While one reviewing physician concluded that Washington would have manipulative limitations arising from scleroderma, no other physicians rendered this opinion.[6]

---

[4] Washington argues that "the ALJ in this case failed to even acknowledge the diagnosis of scleroderma or Raynaud's disease as 'severe' impairments."  This is not a fair reading of the ALJ's opinion.  It is undisputed that these conditions are a connective tissue disorder, which was among the various impairments that the ALJ found to be severe.  R. 22.  The ALJ also specifically acknowledged the diagnoses of scleroderma and Raynaud's syndrome.  *See, e.g.,* R. 15.

[5] Washington also argues that the ALJ's findings were inconsistent with the findings of the first ALJ who rendered an opinion in this case.  Because the decision of the first ALJ was vacated, it is of no assistance to Washington in review of the ALJ's decision on remand.  *See Gibbs v. Barnhart,* 130 Fed. Appx. 426, 430 (11th Cir. 2005).

[6] The ALJ did not ignore the opinion of this reviewing doctor, which was exhibit 8 in the record.  *See* R. 17.  The weight he gave to that opinion is clear from the ALJ's analysis of the limitations arising from Washington's connective tissue disorder, and thus the failure to state specifically the weight given to the opinion is harmless.

Moreover, in December 2001, Dr. Ranganthan determined after examining

Washington that she had nearly normal (4/5) grip strength in both hands.  He wrote that

her gross and fine manipulative ability was well preserved. Because of the occasional

parathesias arising from her condition, Dr. Ranganthan opined that Washington would

occasionally have manipulative difficulties.  This is not inconsistent with the ALJ's finding,

however, that those occasional difficulties would result in only mild limitations in her

manipulative ability.[7]  Therefore, substantial evidence in the record supports the ALJ's

assessment of Washington's manipulative abilities.

Washington also contends that the ALJ did not properly assess the functional

limitations arising from her shortness of breath and fatigue.[8]  In this circuit, subjective

symptoms such as these are evaluated under the "pain standard." "The pain standard

---

[7] Intermingled in her argument about manipulative limitations, Washington asserts that "the ALJ failed to comply with the Appeals Council's reversal of the first administrative law judge's decision, requiring that the new hearing decision make specific functional findings as to reaching." R. 318.  The Appeals Council's remand order noted that the first ALJ did not make specific findings about Washington's ability to reach and handle, but it did not include a requirement in its instruction to the ALJ on remand that such a finding be made.  *See* R. 318.  Washington cites no specific evidence in the record that establishes that she had a limitation on reaching, and she does not argue how the failure to make a specific determination on this issue undermines the ALJ's decision.  Accordingly, to the extent that this issue has been preserved for appeal, *see* n. 8 *infra*, it is unavailing.

[8] In her memoranda, Washington makes passing reference to other deficiencies in the ALJ's analysis, but she does not specifically argue how these deficiencies undermine the ALJ's ultimate conclusion.  *See, e.g.,* Doc. No. 28 at 27 ("The ALJ failed to analyze Ms. Washington's fatigue and other subjective symptoms (including dyspnea, pain, gastric symptoms, etc[.]) in the manner required by the Eleventh Circuit."); *id.* at 22 ([The ALJ] failed to analyze her various medications, failed to analyze her side effects . . . .").  In the scheduling order in this case, I cautioned counsel that issues not raised specifically would be consider to have been waived. Doc. No. 23 at 2.  I find that these passing references to other possible errors are insufficiently specific to preserve any issues for review other than those addressed in the body of this order.

requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995)(citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Id.* at 1562.

The ALJ acknowledged Washington's underlying medical conditions, and noted her complaints of fatigue and shortness of breath on exertion. He carefully reviewed the medical record that showed that Washington's breathing problem, possibly asthma, was stable. He noted that, in 1999, Washington had a normal stress test. While a pulmonary function test performed in May 2003, after the expiration of the OASDI insurance period, showed some decrease in pulmonary function, Washington reported in October 2003 that she could walk 1.5 miles at a time. Dr. Scanlon observed that Washington's fatigue and shortness of breath were likely due in part to deconditioning. The ALJ relied on the evidence of the record, as summarized here, to support his conclusion that Washington's "nonexertional impairments stemming from mild symptoms of depression, discomfort, lack of energy and shortness of breath on exertion do not significantly limit her ability to perform sustained light work activities." R. 25. This finding was explicit and adequate, and it is supported by substantial evidence in the record.

Because the ALJ applied the correct legal standards, and substantial evidence in the record supports his conclusions, no basis exists to overturn the decision of the Commissioner.

## VI.     CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED.**  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 7th day of February 2008.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE